Good morning, may it please the Court, my name is Joseph Russell. I represent the defendant's appellants in this case, namely the police officers Jutiki Jackson and Donald Gaglione. The arguments on appeal are relatively straightforward. Defendants, appellants, are entitled to qualified immunity because the actions they took in initiating the emergency detention of police sergeant Jason Mucha on the evening of November 20, 2012 were objectively reasonable. To begin with, was it reasonable to believe that just Jason Mucha was mentally ill on that evening? And I would argue yes, it was. Why? Because Jason Mucha had been out of work, had not reported to work for approximately eight months leading up to that evening, since March 20, 2012. The allegations and the complaint is that he was not reporting to work because of work-related stress. We also know that that condition, that psychiatric condition, was not improving by the time of the events and issue on November 20, 2012, because he was applying for permanent duty disability benefits, and in support of those benefits, had voluntarily disclosed to a psychiatrist that he had homicidal and suicidal ideation. Specifically, he had thoughts or dreams of committing suicide by cop. Now, this was recorded in the psychiatrist's report, and on the evening of November 20, 2012, as alleged in the complaint, the employee retirement system, which handles all the duty disability benefits of the police officers in the city of Milwaukee, faxed a redacted copy of this psychiatric report that left only unredacted the ideation regarding suicide and thoughts of committing suicide by cop. Understandably, the police department, once they received this report... Counsel, you indicated earlier, what was the length of time between the psychiatrist's written report and the time that the action was taken that you're about to describe? The report was dated November 5, so approximately 15 days before November 20, but the police department did not obtain that report until 4.55 p.m. on November 20, and understandably, when they saw that the last line or the last paragraph in that unredacted report, and this is appendix page 25, Jason Mucha is in a not very veiled manner threatening to shoot people in police command. They understandably, I think, or reasonably, dispatched two police officers, the defendant's appellants in this case, accompanied by a tactical enforcement unit, which is basically a SWAT team that is only deployed when there are extraordinary situations like hostage situations or barricaded suspects. They all went to the plaintiff's residence, whereupon the defendants, in this case the appellants... He was on leave during this time? Yes. He had not reported to work since March 20 of that year, so approximately 88 months. Authorized leave? Yes, I believe so. It's not alleged in the complaint, but that's presumed. Once they arrived at the residence, Mr. Mucha independently confirmed that he had entertained thoughts of suicide and hurting other people, but he disclaimed any real intent on doing so. And that's a fact that the district court picked up on in denying the defendant appellant's qualified immunity, because the district court thought they should have taken... He really had no intention of killing himself or other people. I'm sorry, go ahead. What was the overall time that the plaintiff was detained, from the time that the officers arrived at his place? I understand there was another psychiatric examination at the facility, and then he was  How much time was he actually in custody? He was detained, well, he was in the custody of the defendant appellant's approximately 3 hours and 45 minutes. They took him, well, it's even shorter than that, because the police department received the facts at 4.55, and he was in the mental health complex by 8.40. So sometime between 4.55 and 8.40, they went to his house and took him to the mental health complex. Under 4 hours? Yes, under 4 hours. And then once they transported him to the mental health complex... He was evaluated again there, was he not? Yes, at 10.35 p.m. A treatment director independently reviewed the statement of emergency detention, evaluated the plaintiff, and independently determined that he suffered a mental illness, specifically he gave him a diagnosis of adjustment disorder with disturbance of mood and conduct, and did label him as having, as posing a risk to himself and others. And that was at 10.35 when he signed that report. And then the plaintiff remained, I think, at the mental health complex for approximately 3 days, or 72 hours. Under the state statute at issue, after 72 hours, there has to be a probable cause determination to keep... So what happened after the 72 hours? I'm sorry? So what happened after the 72 hours? As alleged in the complaint, another doctor allowed the plaintiff to leave, determining, I guess, that he was no longer a threat to himself or others. Were any restrictions imposed on him, had to report, or... Not that... Not as alleged in the complaint, and not that I'm aware of. Did he go back to work as a police officer, or did he continue on leave? Again, it's not alleged in the complaint, and I'm trying to stay within the four corners of the complaint because it's a motion for judgment on the pleadings, but I understand he did not allege that he was denied duty disability benefits. So the presumption is that he received them. Was there anybody else at the house when the officers went to seize him? The allegations in the complaint do not indicate anybody else was at the residence of the plaintiff when he spoke with the police officer. So the police were notified, or the police saw this report at 4.55. How long after that did they arrive at his house? It's unclear based on the complaint when they arrived, but it was sometime thereafter. It took, obviously, some time for them to, the police department, to decide to dispatch them to detain the plaintiff for notifying the tactical enforcement unit to send them out to the residence where they spoke, and then transporting them to the health facility. So I'm assuming that probably, it was probably an hour before they arrived. Was there any consideration of whether to ask for a warrant? Well under the state statute, 5115, the emergency detention statute, and as this court has characterized in the case last year involving this statute, the statement of emergency detention is something of a quasi-arrest warrant. So it's, so there's no, it requires no judicial authorization. So there's no need for a warrant, and I haven't seen any other cases within this circuit describing any other legal process. Has there been a challenge to its constitutionality? In Sutterfield, again, this was the only case that I think this court has seen involving the statute. The constitutionality of the statute was not raised by the plaintiff in that case. So taken together, the totality of the circumstances, I think it was reasonable for these police sergeant, no less, had suicidal and homicidal ideation. It's unclear when police officers are dealing with someone that is potentially mentally ill and dangerous, and places them in a difficult position. And that's the point of an emergency detention statute, where based on probable cause, or cause to believe that he is mentally ill and can pose a danger to himself or others, that they take him to a mental health complex where a trained mental health professional can actually evaluate him. What the statute provides is that the police may take him into custody with probable cause, and then the next step, he must be evaluated by a medical professional? That's correct. That's correct. And then there must be a probable cause determination later, after, within, at the end of the 72-hour period from detainment. So it's reasonable for the reasons we've, based on the facts that we've discussed, but it's also reasonable because the defendants would not have been placed on notice that this was somehow wrong based on any case law regarding this emergency detention statute for 20-plus years, stating back to Judge Posner, the opinion he wrote, and Villanova, and Abrams, and Judge Kaney up through 2013, where Fitzgerald and Santoro, the Santoro, emergency detentions, and those involved statutes in Illinois, but they're similar to the Wisconsin statute, that qualified immunity, or it's objectively reasonable for either police officers or trained health professionals to detain an individual that's suspected of posing a risk to himself or others. And even though the individual himself disclaims any real intent, because it doesn't make any sense that anybody would admit that he was going to kill himself or others, because if he actually wanted to do it, why would he admit it? So I don't think it was unreasonable for them to discount the fact that he wasn't actually going to kill the individuals. Well, he said he wasn't going to. He wasn't going to kill the individuals. And when you look at all the cases involving mental health seizures, you see that it's almost uniform where it's a, police officers are in a very difficult position. How are they supposed to figure out whether someone is intending to kill himself or others when you have facts that suggest they are doing it, that they might do it, and their oath of honor requires them to protect the communities they serve. Is there any indication of the aftermath of this, whether he was given drugs or something? Nothing alleged in the complaint. I think it bears noting, even though qualified immunity analysis is an ex ante analysis, I think the fact that the plaintiff isn't contesting the treatment director's determination that he was mentally ill, posed a risk to himself and others, and had this diagnosis of an adjustment disorder. He's not contesting that. And I think this is similar to the case of Fitzgerald and Santoro, where police officers, just based on a report from a dispatcher that someone was possibly suicidal and possibly intoxicated, they still detained her because they didn't have a blood alcohol testing kit with them. But soon thereafter, the hospital said that her blood alcohol was close to 0.3. So it's unreasonable to say, to make that inference, that maybe an hour before when the police officers, in this case, talked to Plaintiff Fumuka, it wasn't reasonable to detain him. But at 10.35 that evening, it was. Honestly, it doesn't make any sense. And I think that's the case as well in the last case in which mental health seizures came up in terms of the Fourth Amendment, in this Bruce V. Guernsey case, a case on which I think Judge Posner was on the panel, where although the state statute at issue wasn't followed to the T, it's not observing to the T all the requirements of the state statute. The Fourth Amendment is a reasonableness requirement. That's the ultimate touchstone. And in that case, in Bruce V. Guernsey, I think it was, although it's the only case that I could identify where a police officer was denied qualified immunity and one was granted qualified immunity, it's a case where it was almost more unreasonable, or it was because she was a minor. She had a father there who was willing to take custody, who was saying that she's not suicidal, and it was based on an unreliable tip of an ex-boyfriend. Whereas here, police officers are working, are relying on a psychiatrist's report that this, as Appendix 25, the last paragraph in this report, Jason Muka is in a not very veiled manner threatening to shoot people in police command. I don't think a police officer, any police officer can ignore that and rely on the comments of the person that... Who did that report go to initially? It went to the Employment Retirement Service, or the Employee Retirement System, which handles the duty disability benefits. Within the police department? And then it's alleged that they sent it to the police department. I'm sorry, is that a separate agency or is that within the police department? It's a separate agency. But it stands in a special relationship. I see my time is up. Okay, thank you, Mr. Russell. Mr. Redko? Good morning, Your Honors. I'm Bill Redko, and I represent the plaintiff, happily, Jason Muka in this case. One thing that I want to start out with is that the facts I've just heard are just contrary to how this circumstance came down. What had happened in this particular case was that Jason Muka, my client, who was a police sergeant with Milwaukee Police Department, had been on leave since March 20th, 2012. He was on authorized leave, by the way, although the complaint doesn't say that. And he was applied for a duty disability status with the police department. The Employee Retirement System, which is a separate agency, the city of Milwaukee, handles duty disability applications and retirements of police officers and other city employees, sent my client to a psychiatrist, Dr. Feinsilver. Dr. Feinsilver conducted an evaluation of Mr. Muka on October 17th. He wrote a report on November 5th, sent it to the Employee Retirement System. It was a 16-page report, 16 pages, Your Honor. The retirement system has a date stamped as received on November 8th, 2012, at 225 in the afternoon. It wasn't until November 20th that somebody at the ERS decided, we need to contact the Milwaukee Police Department and fax a redacted copy of this report, which was then reduced to six pages of just blank statements without any accompanying information around it. Counsel, how does this lapse of time impact on the analysis as to whether the officers were reasonable by acting on the information as soon as they received it? I'm glad you got to that because qualified immunity in this particular case is totally dependent on reasonable grounds for believing that the person seized was subject under the governing legal standard for seizure, and in this case, that's Wisconsin Statute section 5115 sub 1 sub AR. How does the passage of time vis-a-vis the officer's knowledge in that regard affect that standard? Because the statute specifically requires that in order to take a person in for an involuntary commitment, you have to first identify he's mentally ill, second, you have to identify that there's a substantial probability of harm, that he's going to hurt himself or somebody else as manifest by evidence of a recent, recent threat or attempt to suicide or harm to others. The implication, it seems to me, of your argument is that by acknowledging or noting on the face of that transmittal that the report was written 15 days before the policeman received it, that we're charging the policeman now, we're trying to make some determination whether that intervening 15-day period relieves the emergency nature or more particularly relieves the threat. Isn't that asking an awful lot? No, it's not. The statement in that report in pertinent part was this, however, Jason Mucha is in a not very veiled manner threatening to shoot people in police command. He has a considerable stash of firearms. Hearing this, I cannot send him back to work. This is a public safety issue, unquote. Now, admittedly, the policeman knew that this was written 15 days before they had it. But to charge the policeman with the responsibility of looking at that and saying that's 15 days old, they're probably isn't a threat anymore, it seemed to me is way beyond the competence of people we train as policemen. And that's where I have a disagreement with you, Your Honor, and here's why. 15 days have transpired since the date this report was written. As far as the policeman knew, they had no idea that the actual evaluation was on October 17th. But put that aside, what they did know was that a doctor had reached a conclusion in this person's duty disability process that I cannot return this person to work. And the doctor had reached a conclusion based on statements that were on thoughts and dreams that he had threatened in not as such a veiled manner to shoot people in police command and that he had a considerable stash of firearms. I understood the type of... Under those circumstances, why did they not call Dr. Feinsilver and say, Dr. Feinsilver, we have your report here. Why didn't you identify to us which, under Wisconsin law, he's got an obligation and duty and responsibility to report? My question was more narrow than that. You've established a timeline, and the operative timeline seems to say that the report was made on the 5th of November and transmitted to the police officers 15 days later. My question to you is, what is the significance of that 15-day lapse on the officer's judgment of whether or not to go out and arrest this man? Because the officer should know that 15 days is not a recent threat or attempt, even if you could consider it an attempt or threat. What kind of... It's not recent. I see. What kind of training would they have to make that kind of determination regarding mental health that 15 days in conduct recited such as this, in addition to the fact that the policeman, the sergeant, was sitting at an arsenal? How would they have the confidence to know that 15 days is not recent? Because they understand the state statute, that's what they're trained in knowing, is what is a recent threat or attempt? What is the statutory definition of recent? There isn't a statutory or case law definition of recent, however, the dictionary definition of recent is the time before the present. Oh, come on. Look, you can't attach... 15 days is not recent. Hey, don't interrupt me. You can't attach a particular number of days to the word recent, right? If someone says... If President Obama had said on February 2009, well, I recently became president. I recently got a prize. I recently took a trip, right? That could be any period, depends on the context, what is recent. And under this context, recent means hours, days, I mean even the... What do you mean hours, days? Where do you get that idea? You hear someone a week ago threatened to blow up the police station, you say that's not recent because it's not hours or days, it's weeks? Okay, where's the... Two things. Under Sutterfield, this very court said that in order for an officer, Sutterfield, city attorney got up in that particular case and said, listen, if we had learned about this event a day before, we'd have to get a warrant. But because it's within a few hours, we're okay in going out and getting her or whatever without a warrant. To me, when you put that in the context of this case, recent... These events occurred 15 days at best before the police learned of it. It might be recent to the police, but it's not a recent threat or attempt, even if you can consider it a threat or attempt. I don't... That seems to me your very weakest argument. I mean, what if the report said, well, he told us he's actually built an atomic bomb. That worries us. And then you say, well, that's 15 days ago, it hasn't blown up or anything. Weren't the officers reasonable to infer that because somebody in a mental health agency took the trouble to transmit this report to them on November 20th? Well, that's where you're wrong. Let me finish my sentence, please. That somebody there, probably the psychiatrist, thought that was important for them to know this on that date? No. The psychiatrist never contacted the Milwaukee Police Department ever. The psychiatrist's report went to the Employment Retirement System in regard to his duty disability application, which they sat on for 15 days before transmitting it to the police department. This was never Jason Mucha's psychiatrist. This was never transmitted by the psychiatrist to the police department. The police department never spoke to Mr. Feinsilver. The fact of the matter is that on the 20th of November of 2012, the police department received information that was gathered and opined upon by a psychiatrist that a person was dangerous and had an arsenal of weapons. I think that's unrebutted and irrefutable in the record. Now the question is, having received that, was their conduct and immediately acting upon that reasonable? That's the issue. No. I see. No, not only that, but when they complete the report of detention, they fill it full of mistruths. They start out by saying that Jason Mucha specifically stated that he had thoughts of suicide by cop. But here's what they say. Jason Mucha stated that he would go to a command staff meeting with a rifle shooting them until they shoot me. He never said that. He said to his Dr. Feinsilver, I think of going to a command staff meeting. He didn't say, I would go. There's a difference. Did the policeman know that? Yes. He had their report. It's right here on appendix 20. Well, I'm looking at the report, and he says, the doctor said, attributing this to the plaintiff, kill myself or them. Well, that's what the doctor's conclusion is, but here's what Mr. Mucha said in the doctor's report on appendix 22. Don't interrupt so much, would you please? Let the judge finish his question. Thank you. I appreciate that. Yeah, and I didn't mean to interrupt you. The statement is attributed by the doctor to the defendant. It's set out in quotations. Kill myself or them. That's not an opinion. That's not a conclusion. He's attributed a direct statement, presumably after an examination, to the plaintiff. On page 6 of the report that was faxed to the police, which is identified as appendix 22, here's exactly what the doctor had recorded Jason Mucha stating. He then was speaking spontaneously as he said, I've had thoughts of suicide. I've had thoughts of suicide by cop. I don't want to kill myself. He then spoke completely spontaneous, saying, I think of going to a command staff meeting with rifle, shooting them until they shoot me. He did add, I'm not intending to do that. Now, that wasn't also included in the detention report either. Okay, now move three paragraphs down. And he says, the doctor says, when I asked him to what he was referring, he said, attributing this to the plaintiff, kill myself or kill them, end quote. Now, how can that not be construed as a threat? And how can that not be construed in the policeman's objective determination as a recent threat? Are you referring to the part where he says, toward the end of the evaluation, when I asked Jason Mucha whether there was anything else he wished to bring to my attention? Yes. He said, I just can't go back to work. I can't take a chance of them trying to get me? Yes. I could have a real bad ending when I asked what he was referring to. He said, kill myself or kill them? Yes. He wasn't going back to work anytime soon, that was for sure. He was sitting at home with his wife and his four-year-old daughter. We don't know that. That's what I asked, whether he was married and so forth. It's not in the pleadings. But, you know, 15 days, if it's not recent, maybe he would go back to work. At that particular time, he was not reporting back to work. He was not on the duty schedule. He was still on leave. And the duty disability application was still in process. You know, the paragraph you referred to, he says, quote, I think of going to a command staff meeting with a rifle, shooting them and me, end quote. The implication there is that just he may have, we'd say sui sponte, but he may have just voluntarily decided he was going to return to the headquarters with a weapon, regardless of whether he's officially back at work or not. I think that's a fair implication. Well, based on this redacted report, without the information that should have been there, upon which the doctor, you know, under Wisconsin law, Dr. Feinstiel had an obligation and duty and responsibility to report to the police department, those persons who were in jeopardy of potential threats and harm, that this person is a problem to you and he's threatening and harming you. He never contacted them. Except we have to measure the officer's conduct by what they knew and what they could reasonably infer from what they knew. And this is the sum and substance of what they knew. And they could have jumped on the phone and called Dr. Feinstiel. They didn't do that. They get a redacted report from the IRS, an agency that did not have the ability or authority to release this report to the police department to begin with. That's a different allegation and subject matter of the complaint that's still pending in circuit court or district court. But the bottom line is this. Those officers, when they arrive at Mr. Mucha's house, there's no he's not doing anything erratic. He's not doing anything that would cause them to have harm. This isn't a situation of imminent danger. This is a situation they receive information that's 15 days old. They know where he's at. They sent the entire tactical enforcement unit to his home. They knew he was at home with his children and his wife. He's not harming anyone. There's no possibility of him going to work anytime soon. He's not on the duty roster. He's out on leave. There was nothing imminent about any danger that was occurring here. So if they had gone to pick him up a day after they got the report or after the report was sent out, it wouldn't have made any difference. They still wouldn't have had any basis to seize him. In my opinion, that would be correct because, in my opinion, I side with Judge Adelman that there's no threats or acts that would have required them to go pick him up. Okay. Well, thank you. Thank you, Mr. Russell. Mr. Redcoe? What am I talking? I'm sorry. You're Mr. Redcoe. Mr. Russell, do you have anything further? Just a quick point on recent and what recent means. As was noted, there's no definition of recent in the statute. Only guidance we've had, if you can call it guidance, is in 1981 the Wisconsin Assembly tried to define recent in a bill that ended up being unsuccessful that would have defined recent as 180 days preceding the detention. And the Wisconsin Attorney General issued an opinion saying that would be unconstitutional. So that's the outer limits of recent, and there's been no other case law regarding what is or isn't recent. For the reasons I mentioned before, I would ask this Court to reverse the District Court's opinion or decision and entitle defendants to qualified immunity. Thank you. Okay. Thank you very much to both counsel. And my next case for argument is United States v. Garcia.